## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| DEMERY WILLIAMS, | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION** |
| | ) | **No. 4:17-CV-11932-TSH** |
| COLLETTE GOGUEN, | ) | |
| Respondent. | ) | |
| | ) | |

## <u>REPORT AND RECOMMENDATION</u>

### March 22, 2021

Petitioner Demery Williams has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his state court conviction. (Docket #1). Pursuant to 28 U.S.C. § 636(b)(1)(B) and an Order referring the petition to me, (Docket #23), I hereby recommend that the Petitioner's petition be denied and dismissed.

I.      FACTUAL BACKGROUND

A.      The Charged Crime

The facts underlying Petitioner's conviction, summarized below, are set out in the opinion of the Supreme Judicial Court of Massachusetts ("SJC"). The factual findings of the state court are presumed to be correct. 28 U.S.C. § 2254(e)(1); Scoggins v. Hall, 765 F.3d 53, 57 (1st Cir. 2014).

> At approximately 8 a.m. on January 22, 2010, [Petitioner], an employee at a tomato processing plant in Hartford, Connecticut, told his supervisor that he needed to leave work in order to conduct a drug deal. The supervisor gave him permission to leave, and [Petitioner] was picked up by [William] Jones in a white Saturn sport utility vehicle (SUV). The pair drove to a house on Florida Street in Springfield, where Jones, a drug dealer, had been led to believe that he would buy drugs from Curtis Combs, an acquaintance of [Petitioner]. [Petitioner], however, knew that

Jones was going to be robbed.  He went into the house to introduce Jones to Combs, but returned outside to serve as a lookout.

[Petitioner] heard "tussling" inside the house as well as a "zzzt, zzzt" sound. Combs then brought Jones out of the house while striking him in the back of the neck with a stun gun.  After Jones was placed in the back seat of the Saturn, [Petitioner] drove the vehicle to the parking lot of a grocery store in Bloomfield, Connecticut.  [Petitioner] left Jones in the Saturn and was driven back to his workplace in another vehicle.

[Petitioner] returned to work around 12:30 p.m.  He told his coworkers that he had made a profit on the deal and offered to buy them all lunch.  In addition, he gave ten dollars each to his supervisor and to another coworker.  At one point, he fanned out approximately $4,000 to $5,000, mostly in one hundred dollar bills.  The following evening, Jones's body was found lying across the back seat of the Saturn in the grocery store parking lot.  At trial, a medical examiner testified that the cause of his death was ligature strangulation.

The investigation of Jones's death was undertaken primarily by officers of the Bloomfield, Connecticut, police department over a two-week period in early 2010. While searching the Saturn pursuant to a warrant, police found the fingertip from a latex glove on the floor beneath the back seat. Jones's and the [Petitioner's] deoxyribonucleic acid (DNA) profiles were both determined to be contributors to a DNA profile found on the glove fingertip, and to another DNA profile found on one of the headrests in the vehicle.  [Petitioner] routinely wore latex gloves of the same type as part of his work at the tomato processing plant.

Officers of the Bloomfield police department first interviewed [Petitioner] at his workplace on January 25, 2010.  Unbeknownst to [Petitioner], one of the interviewing officers was carrying a pen recorder that audiotaped their conversation, as permitted under Connecticut law.  [Petitioner] told police that Jones had arranged to meet with him on January 22, 2010, but did not show up.  He provided the police with a written, signed statement to that effect.

Video footage from the tomato processing plant, however, showed that [Petitioner] was picked up from work in a white SUV, and dropped off again by a different vehicle around 12:30 P.M. on the day in question.  In addition, cellular site location information (CSLI) for Combs's and [Petitioner's] cellular telephones supported an inference that, during that time period, [Petitioner] had traveled from his workplace to Springfield to meet Combs, and that the pair had traveled back to [Petitioner's] workplace via Bloomfield.

On February 2, 2010, police confronted [Petitioner] with this evidence during a second interview at the Bloomfield police station, which also was recorded without his knowledge by the same means.  As it became clear to [Petitioner] that what he was saying conflicted with evidence police already had obtained, he changed his

story several times.  Eventually, he explained that he had driven with Jones from his workplace to visit Combs in Springfield, on the understanding that Jones would be robbed.  He described the use of the stun gun and his role as a lookout, and stated that he had driven Jones to the grocery store parking lot.  He provided police with a written, signed statement summarizing that version of events as well.  [Petitioner] was not arrested at that time.

For reasons that are not clear from the record, the investigation then stalled until February, 2011, when a trooper of the Massachusetts State police was assigned to the case.  The trooper interviewed several potential witnesses and obtained buccal swabs from [Petitioner] and others that were used for additional DNA testing. In September, 2011, the Hampden County district attorney sought indictments against [Petitioner], and he was arraigned in Massachusetts on October 4, 2011.

 Commonwealth v. Williams, 475 Mass. 705, 706-08 (2016) (footnotes omitted).

B.      Testimony by the Medical Examiner

Before trial, the Connecticut medical examiner who conducted Jones' autopsy and prepared the autopsy report, Dr. Frank Evangelista, was indicted in Massachusetts for perjury and obstruction of justice in an unrelated matter.  Id. at 718.  Although Evangelista was available to testify at trial, the Commonwealth instead opted to present testimony regarding the cause of Jones' death from a substitute medical examiner, Dr. Joann Richmond, a retired forensic pathologist.  Id. Although Petitioner repeatedly objected to the admission of this testimony, Richmond was ultimately allowed to testify regarding the nature of Jones' injuries and to offer her opinion concerning the cause of his death.  Id.  Evangelista's autopsy report was not offered or admitted in evidence.  Id.

On direct examination, Richmond testified that she had been asked to determine the cause of death of the victim in this case.  (S.A. 2026).[1]  Richmond stated that she had reviewed "all of the photographs that were sent to me, . . . the autopsy performed by the pathologist, and . . . one statement made by the [Petitioner]" in preparing for her testimony.  (S.A. 2028).  The prosecutor

---

[1] References to the Respondent's Supplemental Answer will be cited as S.A.

then showed Richmond a series of photographs of Jones' body taken at the crime scene and during
the autopsy that had been introduced throughother witnesses earlier in the trial.  (S.A. 2029-42).
Richmond testified regarding the injuries and other relevant features visible in the photographs
including petechial hemorrhaging in the eye, a "ligature mark," "lividity on the back," and torn
tissue, bleeding, and bruising on the lips.  (Id.).   The prosecutor and Richmond then had the
following exchange:

> Q     Okay.  When you examined the pictures and had read Dr. Evangelista's
>       report and that one statement from the [Petitioner], drawing on your
>       experience as a pathologist and the autopsies, the thousands of autopsies
>       you have performed determining cause of death, were you able to form your
>       own opinion based on all of those items that you reviewed as to William
>       Jones' cause of death?
>
> . . .
>
> A     Yes, I have come to a conclusion.
>
> Q     And what was your – what is your conclusion as to the cause of death?
>
> A     In my opinion he died of ligature strangulation.

(S.A. 2042).  Richmond testified that this conclusion explained the petechial hemorrhaging in the
eye, petechial hemorrhaging in the lips, and the damage to the lips that she observed in the exhibits.
(S.A. 2039, 2043).  The following interchange between the prosecutor and Richmond then took
place:

> Q     One moment please.  There is really no question, you did not perform the
>       actual autopsy?
>
> A.    No, I did not.
>
> Q     However, based on what you have read, looked at and examined, are you
>       confident to a reasonable degree of medical certainty that Mr. Jones died by
>       ligature strangulation?
>
> A.    Yes, I am.

4

(S.A. 2044).

On cross-examination, Richmond testified that, while she read Evangelista's autopsy report, she did not rely on it in forming her opinion.  (S.A. 2063).

II.     PROCEDURAL HISTORY

Petitioner was convicted by a jury in the Hampden Superior Court as a joint venturer of murder in the first degree, armed robbery, and assault and battery by means of a dangerous weapon in connection with the death of William Jones.  Commonwealth v. Williams, 475 Mass. 705, 706 (2016).  The judgments were affirmed by the Massachusetts Supreme Judicial Court ("SJC") on October 17, 2016.  Id. at 723.  On October 10, 2017, Petitioner filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 accompanied by a memorandum of law in support of the petition.  (Dockets #1 and 2).  At the time of these filings, Petitioner was represented by counsel, as he was before the SJC.  The government filed its answer to the petition on December 14, 2017, (Docket #15), and a memorandum of law in support of its opposition to the petition on February 13, 2018, (Docket #20).

On January 6, 2019, Petitioner's counsel filed a motion to withdraw as attorney due to her nomination as an Associate Justice of the Massachusetts Superior Court which was later granted by the court.  (Dockets #21, 22).  The motion to withdraw was filed in conjunction with a motion to appoint successor counsel to Petitioner.  (Id.).  On January 9, 2019, the motion to appoint counsel was referred to the undersigned for a ruling.  (Docket #23).  Noting that there is no constitutional right to counsel in a civil case, I found that Petitioner was not entitled to appointment of counsel as he had failed to allege either indigency or exceptional circumstances, and denied the motion without prejudice.  (Docket #24).  On March 6, 2019, Petitioner filed a second motion for appointment of counsel in which he asserted that he was without funds to retain an attorney.

(Docket #25).  Finding that the Petitioner had not addressed whether exceptional circumstances existed and that the undersigned would be unlikely to find them due to the procedural posture of the case, the undersigned denied the motion without prejudice.  (Docket #27).

III.   PETITIONER'S HABEAS PETITION AND STANDARD OF REVIEW

In his petition for a writ of habeas corpus, Petitioner asserts that the admission of testimony from a substitute medical examiner deprived him of an opportunity to cross-examine the primary examiner, in violation of his Sixth Amendment right to confront witnesses.  (Docket #1 at 5).

"Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), [Petitioner] must show that the challenged state court adjudication was 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' or that the decision 'was based on an unreasonable determination of the facts.'"  Pena v. Dickhaut, 736 F.3d 600, 603 (1st Cir. 2013) (quoting 28 U.S.C. § 2254(d)). This "highly deferential" standard of review "requires the petitioner to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error . . . beyond any possibility for fairminded disagreement.'"  Id. (quoting Burt v. Titlow, 571 U.S. 12, 20-21 (2013)) (alteration in original).

"Clearly established federal law" under § 2254(d)(1) refers to the "governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision" and must be "holdings, as opposed to the dicta."  Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003) (internal quotation omitted).  A state court decision is "contrary to" existing Supreme Court precedent if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court; or (2) it confronts a set of facts that are materially indistinguishable from a decision of the

Supreme Court but reaches a result different from Supreme Court precedent.  Dagley v. Russo,
540 F.3d 8, 16 (1st Cir. 2008) (quoting Early v. Packer, 537 U.S. 3, 8 (2002)).

"[A] state court adjudication constitutes an unreasonable application 'if the state court
identifies the correct governing legal principle from the Supreme Court's then-current decisions
but unreasonably applies that principle to the facts of the prisoner's case.'"  Hensley v. Roden, 755
F.3d 724, 731 (1st Cir. 2014) (quoting Abrante v. St. Amand, 595 F.3d 11, 15 (1st Cir. 2010)).
State court applications of federal law must be more than "incorrect or erroneous" to merit habeas
relief; they must be "objectively unreasonable."  Wiggins v. Smith, 539 U.S. 510, 520-21 (2003).

When determining whether the state court's decision was based on an unreasonable
determination of the facts, reviewing courts "may not characterize . . . state-court factual
determinations as unreasonable 'merely because [they] would have reached a different conclusion
in the first instance."  Brumfield v. Cain, 576 U.S. 305, 313-14 (2015).  Pursuant to 28 U.S.C.
§ 2254(e)(1), "a determination of a factual issue made by a State court shall be presumed to be
correct."  This presumption applies to findings of historical, basic or primary facts – "facts in the
sense of a recital of external events and the credibility of their narrators."  Coombs v. Maine, 202
F.3d 14, 18 (1st Cir. 2000) (quoting Bryson v. Ward, 187 F.3d 1193, 1211 (10th Cir. 1999)).  The
petitioner may rebut this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).
Review under § 2254(d)(2) "is limited to the record that was before the state court."  Garuti v.
Roden, 733 F.3d 18, 23 (1st Cir. 2013) (quotation and alteration omitted).

IV.   DISCUSSION

The Sixth Amendment to the United States Constitution, made applicable to the states by
the Fourteenth Amendment, provides that an accused has "the right . . . to be confronted with the
witnesses against him."  U.S. Const. amend. VI.  The SJC concluded that the admission of

testimony at trial from a substitute medical examiner who did not conduct the autopsy, despite the availability of the original examiner, did not violate Petitioner's Confrontation Clause rights. Williams, 475 Mass. at 718-19.   Petitioner argues that the state court's decision involved an unreasonable application of clearly established Federal law, namely, Crawford v. Washington, 541 U.S. 36 (2004); Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009); and Bullcoming v. New Mexico, 564 U.S. 647 (2011).   (Docket #2 at 8-11).   Petitioner fails to cite another in this line of cases, Williams v. Illinois, 567 U.S. 50 (2012).

A.      Applicable Precedent

In Crawford, the Supreme Court held that "[t]estimonial statements of witnesses absent from trial" are admissible "only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine."   Crawford, 541 U.S. at 59.   The court left "for another day any effort to spell out a comprehensive definition of 'testimonial,'" but found that the term "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations."   Id. at 68.   Nontestimonial statements do not implicate the Confrontation Clause.   Davis v. Washington, 547 U.S. 813, 821 (2006).

Five years later, in 2009, the Supreme Court extended Crawford's holding to affidavits prepared in a state medical laboratory as to the quantity and nature of a seized drug in Melendez-Diaz.   Melendez-Diaz, 557 U.S. at 311.   In that case, the government submitted three "certificates of analysis," sworn to before a notary public by analysts at the State Laboratory Institute of the Massachusetts Department of Public Health, reporting that substance seized by the police and connected to the defendant contained cocaine.   Id. at 307-08.   The defendant argued that the admission of the certificates violated his Confrontation Clause rights because the analysts did not testify in person.   Id. at 309.   The Court agreed, holding in a five to four decision that the certificates

8

were "within the core class of testimonial statements" under Crawford, finding that, although the documents were denominated "certificates," they were quite plainly affidavits, and that these affidavits were clearly made for purposes of trial and so amounted to witness testimony subject to the Confrontation Clause. Id. at 310-11; see Nardi v. Pepe, 662 F.3d 107, 111 (1st Cir. 2011). However, the necessary fifth vote for the majority limited his support to "formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions." Melendez-Diaz, 557 U.S. at 329-30 (Thomas, J., concurring).

In 2011, the Supreme Court decided Bullcoming, which involved a charge of driving while intoxicated. Bullcoming, 564 U.S. at 651. The principal evidence against the defendant was a forensic laboratory report certifying that his blood-alcohol concentration was well above the threshold for aggravated DWI. Id. At trial, instead of calling as a witness the analyst who signed the certification, the prosecution called another analyst who was familiar with the laboratory's testing procedures but had neither participated in nor observed the test on the defendant's blood sample. Id. The Supreme Court held that the report was testimonial, even though it was unsworn, as it was "created solely for an 'evidentiary purpose' . . . in aid of a police investigation." Id. at 664 (quoting Melendez-Diaz, 557 U.S. at 311). The Court held that the testimony of the substitute analyst was not adequate to admit the report under the Sixth Amendment as such testimony would not convey what the non-testifying analyst who signed the certification "knew or observed about the events his certification concerned, i.e., the particular test and testing process he employed" nor could the substitute analyst's testimony "expose any lapses or lies on the certifying analyst's part." Id. at 661-62. Justice Sotomayor, concurring in part and providing the necessary fifth vote for the majority, observed that this was "not a case in which an expert was asked for his independent opinion about underlying testimonial reports that were not themselves admitted into evidence,"

and noted that the Court "would face a different question if asked to determine the constitutionality of allowing an expert witness to discuss others' testimonial statements if the testimonial statements were not themselves admitted as evidence." Id. at 673 (Sotomayor, J., concurring).

One year later, in Williams, the Supreme Court addressed whether Crawford barred an expert from expressing an opinion based on facts about a case that had been made known to the expert but about which the expert was not competent to testify. Williams, 567 U.S. at 56. In Williams, a forensic specialist testified at the defendant's bench trial for rape that a DNA profile derived from semen on vaginal swabs taken from a rape victim produced by Cellmark Diagnostics Laboratory, an outside laboratory in Maryland, matched a DNA profile derived from a sample of the defendant's blood produced by the Illinois State Police lab. Id. at 59-62. The Cellmark report was not admitted into evidence nor read from at trial. Id. at 62. All of the Justices, including the dissent, held that the expert could opine whether two DNA samples match each other. See id. at 71-72 (plurality opinion), at 88 (Breyer, J., concurring), at 103 (Thomas, J., concurring in the judgment), at 129 (Kagan, J. dissenting). The dispute arose over whether "the expert went astray when she referred to the DNA profile provided by Cellmark as having been produced from semen found on the victim's vaginal swabs." Id. at 57.

The plurality opinion, authored by Justice Alito, was signed by Chief Justice Roberts as well as Justices Kennedy and Breyer. Id. at 56. Justice Breyer filed a separate concurring opinion explaining why he joined Justice Alito's opinion "in full." Id. at 99. The plurality concluded on two independent grounds that the forensic specialist's testimony was constitutionally permissible. First, the plurality reasoned that the specialist's testimony was constitutionally permissible because it "was not offered to prove the truth of the matter asserted," but was instead related "solely for the purpose of explaining the assumptions on which [her expert] opinion rests and "thus fall[s]

outside the scope of the Confrontation Clause." Id. at 57-58.  This conclusion was found by the plurality to be "entirely consistent with Bullcoming and Melendez-Diaz," where the forensic reports were admitted in evidence "for the purpose of proving the truth of what they asserted:  in Bullcoming that the defendant's blood alcohol level exceeded the legal limit and in Melendez-Diaz that the substance in question contained cocaine."  Id. at 79.  The plurality concluded that "[n]othing comparable happened" as "the Cellmark report was not introduced into evidence" and the "expert witness referred to the report not to prove the truth of the matter asserted in the report, i.e., that the report contained an accurate profile of the perpetrator's DNA, but only to establish that the report contained a DNA profile that matched the DNA profile deduced from petitioner's blood."  Id.  Alternatively, the plurality reasoned, there was no Confrontation Clause violation because the Cellmark report was prepared for the primary purpose of finding a dangerous rapist who was still at large, not "for the primary purpose of accusing a targeted individual."  Id. at 84. The plurality noted that "no one at Cellmark could have possibly known that the profile that it produced would turn out to inculpate petitioner – or for that matter, anyone else whose DNA profiled was in a law enforcement database."  Id. at 84-85.  The plurality found that "[u]nder these circumstances, there was no 'prospect of fabrication' and no incentive to produce anything other than a scientifically sound and reliable profile."  Id. at 85 (quoting Michigan v. Bryant, 562 U.S. 344, 361 (2011)).

Justice Thomas wrote separately in a concurring opinion in which he agreed with the plurality's conclusion that the forensic specialist's testimony did not offend the Confrontation Clause, but for a completely different reason.  Justice Thomas found that the Cellmark report "lack[ed] the solemnity of an affidavit or deposition" and was therefore not "testimonial."  Id. at 111 (Thomas, J., concurring).  Justice Thomas rejected the plurality's primary purpose test as

"lack[ing] any grounding in constitutional text, in history, or in logic." <u>Id.</u> at 114.  A dissenting opinion by Justice Kagan, signed by Justices Scalia, Ginsburg, and Sotomayor, disagreed with the reasoning of both the plurality and Justice Thomas, concluding that the forensic specialist's testimony violated the Confrontation Clause. <u>Id.</u> at 120 (Kagan, J, dissenting).    Both the dissent and Justice Thomas agreed that the forensic specialist's statements about Cellmark's report went to its truth. <u>Id.</u> at 104 (Thomas, J., concurring), 125 (Kagan, J. dissenting).

B.      Application to the Instant Case

Petitioner argues that the state court unreasonably applied clearly established federal law by holding that "admission of testimonial out-of-court statements by a substitute medical examiner that deprived [Petitioner] of his right to cross-examine the primary examiner did not violate [Petitioner's] confrontation rights."  (Docket #2 at 7).  Respondent correctly argues that this argument is factually incorrect as Richmond did not testify to any out-of-court statement whether testimonial or not.

Evangelista's autopsy report was not introduced into evidence, in whole or in part. <u>Williams</u>, 475 Mass. at 718.  Nor did Richmond quote or discuss the contents of the autopsy report during her testimony; she merely stated that she had reviewed the report in preparation for her testimony. (S.A. 2028).  Richmond further testified on cross-examination that she did not rely on the autopsy report in forming her opinion.[2]  (S.A. 2063).  Defense counsel had a full opportunity to cross-examine Richmond concerning her opinions.  Hence there was no violation of Petitioner's rights under the Confrontation Clause.  As no statements of Evangelista were introduced at trial, he was in no way a "witness" subject to confrontation.  See <u>Crawford</u>, 541 U.S. at 51.

---

[2] As Richmond did not rely on the autopsy report in forming her opinion and the autopsy report was not introduced into evidence, the undersigned need not determine whether the autopsy report was "testimonial" in nature.

V.      CONCLUSION

For the foregoing reasons, I RECOMMEND that the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Docket #1) be DENIED AND DISMISSED.[3]


/s/ David H. Hennessy
David H. Hennessy
UNITED STATES MAGISTRATE JUDGE

---

[3] The parties are hereby advised that, under the provisions of Fed. R. Civ. P. 72, any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objections are made and the basis for such objections.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation.  See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Emiliano Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-05 (1st Cir. 1980); see also Thomas v. Arn, 474 U.S. 140 (1985).